[No. S143040. June 2, 2008.]

JOSE DE JESUS VERDIN, Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

1098

## COUNSEL

Gary Windom, Public Defender, and Richard V. Myers, Deputy Public Defender, for Petitioner.

Michael P. Judge, Public Defender (Los Angeles), Albert J. Menaster and Terri Towery, Deputy Public Defenders, as Amici Curiae on behalf of Petitioner.

John T. Philipsborn for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Grover Trask, District Attorney, Elise J. Farrell and Elaina Gambera Bentley, Deputy District Attorneys, for Real Party in Interest.

Thomas J. Orloff, District Attorney (Alameda) and Jeff H. Rubin, Deputy District Attorney, for the California District Attorneys Association as Amicus Curiae on behalf of Real Party in Interest.

## OPINION

**WERDEGAR, J.**—Petitioner, who stands charged with attempted premeditated murder as well as various other felony offenses, has announced his intention to rely on a "diminished actuality" defense. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1253 [120 Cal.Rptr.2d 432, 47 P.3d 225].) That is, he intends to argue that as a result of his voluntary intoxication or mental condition, he did not actually entertain the requisite mental state for the charged crimes. In support of this defense, he intends to rely on the expert testimony of Dr. Francisco Gomez, a psychiatrist who examined him and has formed opinions regarding his mental state at the time of the crimes. The prosecution naturally seeks pretrial discovery of Dr. Gomez's interview notes and final report. It also seeks something more.

We decide in this case whether a trial court may order petitioner, a criminal defendant, to grant access for purposes of a mental examination, not to a court-appointed mental health expert, but to an expert retained by the prosecution. We conclude the Court of Appeal erred in concluding the court was authorized to issue such an order. We therefore reverse the appellate court's denial of a writ of mandate.

## FACTS

On May 7, 2004, the District Attorney for Riverside County filed an information charging petitioner Jose de Jesus Verdin with the premeditated and deliberate attempt to murder his wife. (Pen. Code, §§ 664, 187.)[1] The information also alleged petitioner discharged a firearm in the commission of that offense, an enhancement allegation that, if sustained, will add an additional and consecutive term of 20 years to his sentence. (§ 12022.53, subd. (c).) Counts two through five of the information charge petitioner with assault with a firearm, willful discharge of a firearm in a grossly negligent manner, corporal injury on a spouse or former spouse, and felony child endangerment. (§§ 245, subd. (a)(2), 246.3, 273.5, subd. (a), 273a.)

---

[1] All further unlabeled statutory references are to the Penal Code.

Evidence presented at the preliminary hearing indicated police were called to petitioner's Beaumont, California, house on January 12, 2004, about 1:40 a.m. Officers Velazquez and Loera found petitioner, naked, sitting on his front porch. When they entered his house, it was in disarray. Petitioner volunteered that he had killed his daughter. Investigating, Officer Loera first noticed fresh blood in the bedroom and then discovered petitioner's wife in the house; she appeared to have been beaten up. She explained to police that petitioner had thrown her around the house. When she fled the house, she heard gunshots behind her and assumed petitioner was shooting at her, although she never turned around to see. In the house, police found a revolver containing six expended shells.

On further investigation, police discovered petitioner's two-year-old daughter, alive, at a neighbor's home. She bore evidence of having been beaten about the head and had a bruise around her neck as if she had been strangled. Back at the police station, petitioner waived his *Miranda*[2] rights and admitted he had pressed his knee into the back of his daughter's neck, pushing her face against the bed. He had then picked her up by the neck, pulled her hair, choked her, and struck her in the face with a closed fist. When asked why he had attacked his young daughter, he said "she wouldn't shut up" and he knew what he did was "evil." He further explained he had assaulted his wife because he was "mad." He also admitted he tried to shoot his wife. Following the preliminary hearing, petitioner was held to answer on all charges.

Thereafter, petitioner noticed his intention to defend against the charges by relying on a diminished actuality defense and, in support, produced a report setting forth Dr. Francisco Gomez's psychological evaluation of him. The prosecution thereafter sought informal discovery (see § 1054.5, subd. (b)) by sending defense counsel a letter requesting Dr. Gomez's records, notes, and test results, as well as "access to your client for purposes of mental examination." The prosecution asserted that because petitioner had placed his mental state in issue, it was entitled by our decision in *People v. Carpenter* (1997) 15 Cal.4th 312 [63 Cal.Rptr.2d 1, 935 P.2d 708] to have the court order him to submit to a mental examination by a prosecution expert. When this informal request failed, the prosecution moved formally to compel discovery, expressly seeking "[a]ccess to the defendant for purposes of [a] mental examination." In its written motion, the prosecution expressly relied on *Carpenter* and also argued petitioner had waived any objection to such an examination by placing his mental state in issue.

Petitioner did not oppose the request for Dr. Gomez's written materials but opposed the motion to have him submit to a psychiatric examination administered by a prosecution expert. The trial court granted the prosecution's

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

request, finding the prosecution's position "well-taken." After issuing an alternative writ of mandate, the Court of Appeal filed an opinion denying relief. We granted review and stayed the psychiatric examination ordered by the trial court pending our decision.

## DISCUSSION

Petitioner makes two primary arguments. First, he contends the trial court's order that the prosecution be granted access to him for purposes of a mental examination by a prosecution retained expert is not authorized by state law. Second, he contends that even if such an order is authorized by state law, it would violate his rights under both the California and United States Constitutions. Although the use of evidence from an undesired psychiatric examination to convict a criminal defendant may have constitutional implications (see *Estelle v. Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866]), because we do not reach constitutional issues unless necessary to do so (*People v. Brown* (2003) 31 Cal.4th 518, 534 [3 Cal.Rptr.3d 145, 73 P.3d 1137]) we turn first to examine petitioner's state law arguments.

The trial court's order granting the prosecution access to petitioner for purposes of a mental examination by a prosecution expert affords the prosecution the opportunity to obtain evidence directly from the accused. As such, petitioner claims, the order grants the prosecution a form of pretrial discovery no different than had the court ordered him to sit for a deposition in a civil case. Accordingly, petitioner argues, as a form of discovery, the availability of the examination is governed strictly by statute.

The California laws governing discovery in criminal cases underwent a major change on June 5, 1990, when the electorate approved Proposition 115, the Crime Victims Justice Reform Act. (See *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 286 [279 Cal.Rptr. 592, 807 P.2d 434].) As we explained in *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 364 [285 Cal.Rptr. 231, 815 P.2d 304], "Proposition 115 added both constitutional and statutory language authorizing reciprocal discovery in criminal cases." The new constitutional provision, article I, section 30, subdivision (c) of the California Constitution, declares that "[i]n order to provide for fair and speedy trials, discovery in criminal cases shall be reciprocal in nature, as prescribed by the Legislature or by the People through the initiative process."

The same proposition also added chapter 10 to part 2, title 6 of the Penal Code, commencing with section 1054 (hereafter the criminal discovery statutes), establishing the procedures for, and limitations on, discovery in

criminal cases. Section 1054 sets forth the purposes of this new chapter, including that "no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States." (*Id.,* subd. (e).) We have emphasized this statutory exclusivity, noting that "all court-ordered discovery is governed exclusively by—and is barred except as provided by—the discovery chapter newly enacted by Proposition 115." (*In re Littlefield* (1993) 5 Cal.4th 122, 129 [19 Cal.Rptr.2d 248, 851 P.2d 42].) This is especially true of prosecutorial discovery, which "often raises complex and serious constitutional questions. It is for this reason that . . . the initial consideration of laws governing such are more appropriately to be initially decided by the Legislature." (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1167 [78 Cal.Rptr.2d 819].)

Our first task, then, is to determine whether the trial court's order is a form of discovery authorized by the criminal discovery statutes. To resolve that question, we must resolve the threshold question: Is such an examination "discovery"?

### 1. *Is a Mandatory Psychiatric Examination "Discovery"?*

The People, real party in interest in this case, first argue a court-ordered psychiatric examination falls outside of, and is thus not governed by, the criminal discovery statutes because those statutes create a mechanism for requiring the disclosure of evidence already in existence and in the possession of an opposing party. Citing the language of sections 1054.1 and 1054.3, the People contend the criminal discovery statutes "presume[] that the evidence to be disclosed already exists. A mere order compelling a defendant to submit to an examination does not constitute 'discovery,' because nothing has as yet been produced that should be disclosed under the discovery statutes."

We agree that the sections cited refer to information already reduced to physical form or otherwise known to the prosecution. For example, under section 1054.1, the prosecutor must disclose the "names and addresses" of witnesses (subd. (a)); "[s]tatements of all defendants" (subd. (b)); "[a]ll relevant real evidence seized or obtained" (subd. (c)); felony convictions of material witnesses (subd. (d)); "[a]ny exculpatory evidence" (subd. (e)); and "[r]elevant written or recorded statements of witnesses" including "the results of physical or mental examinations, scientific tests, [and] experiments" (subd. (f)). Defendants have a similar, though not identical, statutory obligation to disclose evidence to the prosecution. (§ 1054.3, subds. (a), (b).)

Accordingly, the People have requested, and petitioner does not oppose, discovery of all written or recorded information in Dr. Gomez's possession.

We disagree, however, that the descriptions in sections 1054.1 and 1054.3 of materials subject to discovery can fairly be read to exclude other types of materials from the reach of the criminal discovery statutes. First, sections 1054.1 and 1054.3 do not express such a limitation. Second, a psychiatric examination of a party has long been considered a form of pretrial discovery. For example, in *Ballard v. Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838], a case in which a defendant was charged with sexual assault, we considered whether the defendant was entitled to three forms of pretrial discovery from the prosecution: (1) statements of all witnesses who testified before the grand jury; (2) records of a polygraph examination performed on the prosecuting witness (*id.* at pp. 165–171); and (3) *a pretrial psychiatric examination of that witness* (*id.* at pp. 171–177). *Ballard* held the trial court had discretion to order the complaining witness—as a form of pretrial discovery—to submit to a pretrial psychiatric examination "for the purpose of determining whether her mental or emotional condition affected her veracity." (*Id.* at p. 171.) Although the doctrinal underpinnings of *Ballard*'s holding have since been discredited (see *People v. Anderson* (2001) 25 Cal.4th 543, 575 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1310–1312 [116 Cal.Rptr.2d 700]) and the holding itself superseded by statute (§ 1112), it remains clear that, at least as early as 1966, we considered that a mental examination could be a form of pretrial discovery.

█ Third, the Legislature recognizes such examinations are a form of discovery. Code of Civil Procedure section 2032.020, subdivision (a), part of the Civil Discovery Act (*id.*, § 2016.010 et seq.), provides that "[a]ny party may obtain discovery . . . by means of a physical or *mental examination* of . . . a party to the action . . . ." (Italics added.) As the People fail to proffer a persuasive explanation why a mental examination constitutes a form of discovery in civil cases but not in criminal cases, we conclude a court-ordered mental examination of a defendant is discovery within the meaning of the criminal discovery statutes.

*Centeno v. Superior Court* (2004) 117 Cal.App.4th 30 [11 Cal.Rptr.3d 533] (*Centeno*), on which the People rely, does not compel a different result. In *Centeno,* the defendant, charged with capital murder, sought a pretrial determination of his possible mental retardation, which would have made him ineligible for the death penalty. (*Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335, 122 S.Ct. 2242].) The trial court ordered the defendant to

submit to a mental retardation examination by a prosecution expert, and he appealed. While his appeal was pending, the Legislature enacted statutory procedures to allow for the determination of retardation in capital cases. (§ 1376.) In rejecting the defendant's claim that forcing him to submit to an examination by a prosecution expert would violate the criminal discovery statutes, the *Centeno* court explained that "[e]xamination of a defendant by a prosecution expert is unrelated to disclosure of information by defense counsel and thus is not logically encompassed by the criminal discovery statutes." (*Centeno*, at p. 41.)

Because section 1376, subdivision (b)(2) authorized the trial court in *Centeno* to appoint an expert to examine the defendant, the discovery order in that case was authorized by an "express statutory provision[]," as required by section 1054, subdivision (e). Accordingly, the Court of Appeal's conclusion that the examination did not constitute discovery under the criminal discovery statutes was unnecessary. Moreover, the court's dictum is not persuasive on its own terms. First, the court does not discuss *Ballard v. Superior Court, supra*, 64 Cal.2d 159, or the fact mental examinations are considered a type of discovery in civil cases (Code Civ. Proc., § 2032.020). Further, by concluding that a mental examination was not a form of discovery within the criminal discovery statutes, the court necessarily assumed that Penal Code section 1054.3 described the universe of information a prosecutor can discover from a criminal defendant. But although section 1054.3 lists only evidence that is tangible, has been reduced to physical form, or is information otherwise known to the prosecution, the section does not state that it is an exclusive list, nor does it purport to be. In fact, materials not listed in section 1054.3 are discoverable by the prosecution if required by some other statute or mandated by the United States Constitution. For example, although an expert examination for mental retardation is not mentioned in section 1054.3, such an examination is authorized by section 1376. Because the criminal discovery statutes allow for prosecutorial discovery of materials from a criminal defendant that do not fall within section 1054.3, the premise of the *Centeno* court's analysis on this point was incorrect.

Having concluded a mental examination is a form of discovery subject to the criminal discovery statutes, we turn next to whether such an examination is authorized by those statutes.

### 2. Do the Criminal Discovery Statutes Authorize a Trial Court to Order a Psychiatric Examination?[3]

The People argue that because petitioner placed his mental state in issue by announcing his intention to rely on a diminished actuality defense, a long-established rule in California authorizes the trial court to order the prosecution be granted access to him for purposes of a mental examination by an expert retained by the prosecution. The People cite a number of cases which they contend support this rule. (*People v. McPeters* (1992) 2 Cal.4th 1148 [9 Cal.Rptr.2d 834, 832 P.2d 146] (*McPeters*); *People v. Carpenter, supra*, 15 Cal.4th 312 (*Carpenter*); *People v. Danis* (1973) 31 Cal.App.3d 782 [107 Cal.Rptr. 675] (*Danis*).) Following the passage of Proposition 115 in 1990 and the enactment of the criminal discovery statutes, however, any discovery rules announced in the cited cases require more rigorous justification. As explained, *ante*, section 1054, subdivision (e) provides that "no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States." "[A]ll court-ordered discovery is governed exclusively by—and is barred except as provided by—the discovery chapter newly enacted by Proposition 115." (*In re Littlefield, supra*, 5 Cal.4th at p. 129.)

■ We conclude that *Danis, McPeters,* and *Carpenter* have not survived the passage of Proposition 115. *Danis, supra*, 31 Cal.App.3d 782, opined that prosecutorial discovery from a criminal defendant, in the form of a court-ordered mental examination, was permissible even absent an "authorizing statute," because the trial court possessed inherent power to order such discovery. This reasoning is insupportable following the 1990 enactment of section 1054, subdivision (e), which insists that rules permitting prosecutorial discovery be authorized by the criminal discovery statutes or some other statute, or mandated by the United States Constitution. Although *Danis's result* may have been supportable when decided more than 30 years ago—a point we need not reach here—no part of its *reasoning* can have survived the enactment of section 1054, subdivision (e).

Similarly, the rule announced in *McPeters, supra*, 2 Cal.4th 1148, and followed in *Carpenter, supra*, 15 Cal.4th 312, did not survive Proposition

---

[3] We speak here only of the trial court's authority to grant the People's retained expert access to petitioner for purposes of a mental examination, not actual physical compulsion. Of course, a person cannot be physically compelled to submit to a psychiatric examination, but if a trial court has the legal authority to order a defendant to comply, then a defendant's failure to do so can lead to legal consequences. (See, e.g., *People v. Sumahit* (2005) 128 Cal.App.4th 347 [27 Cal.Rptr.3d 233] [inmate's failure to cooperate with prosecution experts resulted in his forfeiture of the right to challenge the sufficiency of the People's showing of his present dangerousness in a sexually violent predator proceeding].)

115. Neither decision explained the basis—statutory or otherwise—of its assertion that a criminal defendant who places his mental state in issue thereby creates in the prosecution the right to discovery in the form of a mental examination by a prosecution expert. Because neither *McPeters* nor *Carpenter* rests on a statutory or constitutional basis, both are inconsistent with section 1054, subdivision (e).[4]

The People contend the abrogation of the "sound principle that a defendant who places his mental state in issue must submit to a prosecution examination" would thwart an express purpose of Proposition 115, namely to make "comprehensive reforms . . . in order to restore *balance and fairness* to our criminal justice system." (Ballot Pamp., Primary Elec. (June 5, 1990) text of Prop. 115, § 1, subd. (a), p. 33, italics added (hereafter Ballot Pamphlet).) The People cite the preamble to Proposition 115, which provides in part: "[W]e the people further find that it is necessary to reform the law as developed in numerous California Supreme Court decisions as set forth in the statutes of this state. These decisions and statutes have unnecessarily expanded the rights of accused criminals far beyond that which is required by the United States Constitution, thereby unnecessarily adding to the costs of criminal cases, and diverting the judicial process from its function as a *quest for truth.*" (Ballot Pamp., *supra,* text of Prop. 115, § 1, subd. (b), p. 33, italics added, also quoted in *Williams v. Superior Court* (1996) 46 Cal.App.4th 320, 336 [53 Cal.Rptr.2d 832].)

In order to effectuate the goals set forth in the preamble to Proposition 115, however, the framers of that initiative did not authorize the judiciary generally to create appropriate rules governing discovery in criminal cases. Although we must interpret the statutes governing discovery in criminal cases, we are not at liberty to create new rules, untethered to any statute or constitutional mandate. Instead, the framers of Proposition 115, by including the exclusivity provision of section 1054, subdivision (e), authorized *the Legislature* to create the applicable rules in the first instance. Only when interpreting a statute or where a rule of discovery is "mandated by the

---

[4] The People also rely on *People v. Coddington* (2000) 23 Cal.4th 529, 611–612 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069 [108 Cal.Rptr.2d 409, 25 P.3d 618]. Like *Carpenter* and *McPeters, Coddington* applied the law before Proposition 115 and did not explicitly rely on a statutory or a constitutional basis. Instead, *Coddington* simply cited *McPeters* for the general proposition that a prosecution expert must be given access to a defendant for purposes of a mental examination when that defendant places his mental state in issue, and that comment to the jury was permissible if the defendant refused access. To the extent *Coddington* relied on *McPeters,* that part of *Coddington* did not survive Proposition 115. We express no opinion on whether a statutory basis for a post-Proposition 115 rule might exist in cases, like *Coddington,* that involve a plea of not guilty by reason of insanity. (See § 1027 [regarding the appointment of experts in insanity cases]; *Coddington,* at pp. 560–561 [prosecution called court-appointed experts]; *id.* at p. 658 (dis. opn. of Mosk, J.) [recognizing same].)

Constitution of the United States" (§ 1054, subd. (e)) does this court have a role. (See discussion, *post.*) We thus conclude that nothing in the preamble to Proposition 115 authorizes or justifies the judicial creation of a rule that a criminal defendant who places his mental state in issue may be ordered by the court to grant the prosecution access for purposes of a mental examination by a prosecution expert.

Irrespective of whether *Danis, McPeters,* or *Carpenter* survived the 1990 enactment of Proposition 115, the People contend that "after the enactment of the criminal discovery statutes, courts have upheld the right of the prosecution to obtain an examination of a defendant who places his mental state in issue." In support, the People cite *In re Hawthorne* (2005) 35 Cal.4th 40 [24 Cal.Rptr.3d 189, 105 P.3d 552] (*Hawthorne*), *Centeno, supra,* 117 Cal.App.4th 30, and *People v. Sumahit, supra,* 128 Cal.App.4th 347 (*Sumahit*). None of these cases stands for the broad proposition that a criminal defendant, by placing his mental state in issue, necessarily agrees in all cases to give a prosecution expert access for purposes of a mental examination.

*Hawthorne, supra,* 35 Cal.4th 40, and *Centeno, supra,* 117 Cal.App.4th 30, both involved criminal defendants facing the death penalty who claimed their mental retardation rendered execution an impermissible penalty under the Eighth Amendment to the United States Constitution. (*Atkins v. Virginia, supra,* 536 U.S. 304.) In *Centeno* the issue arose pretrial. The defendant thus was subject to the statutory procedure enacted by our Legislature in response to *Atkins* whereby capital defendants can attempt to prove their retardation (§ 1376), including requesting the appointment of experts (*id.,* subd. (b)(2)).[5] In *Hawthorne,* the defendant had already been convicted. We held that, in postconviction cases, courts should follow the procedures in section 1376 "as closely as logic and practicality permit" so as "to avoid due process and equal protection implications." (*Hawthorne,* at p. 47.) In other words, the examinations in these cases were permissible not simply because the defendants placed their mental states in issue by claiming they were mentally retarded, but because the proceedings were governed by statutory and constitutional considerations that are inapplicable to the instant case.

*Sumahit, supra,* 128 Cal.App.4th 347, involved yet another statutory scheme. In that case, an inmate subject to a sexually violent predator (SVP) petition under Welfare and Institutions Code section 6600 was examined by a defense expert but refused to submit to an examination by two experts who

---

[5] Section 1376, subdivision (b)(2) states in pertinent part: "Nothing in this section shall prohibit the court from making orders reasonably necessary to ensure the production of evidence sufficient to determine whether or not the defendant is mentally retarded, *including, but not limited to, the appointment of, and examination of the defendant by, qualified experts.*" (Italics added.)

testified for the People. (*Sumahit,* at p. 351.) *Sumahit* is distinguishable because the SVP proceeding is civil in nature. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1175 [81 Cal.Rptr.2d 492, 969 P.2d 584].) Moreover, like the mental retardation determinations at issue in *Hawthorne, supra,* 35 Cal.4th 40, and *Centeno, supra,* 117 Cal.App.4th 30, in SVP cases the appointment of experts to examine an inmate named in a petition is expressly authorized by statute. (See Welf. & Inst. Code, §§ 6601, subd. (d), 6603, subd. (c)(1).)

■ In sum, we conclude that (1) any rule that existed before 1990 suggesting or holding a criminal defendant who places his or her mental state in issue may thereby be required to grant the prosecution access for purposes of a mental examination by a prosecution expert was superseded by the enactment of the criminal discovery statutes in 1990, and (2) nothing in the criminal discovery statutes (§ 1054 et seq.) authorizes a trial court to issue an order granting such access.

### 3. *Is a Court-ordered Psychiatric Examination Authorized by Some "Other Express Statutory Provision"?*

The criminal discovery statutes permit discovery if authorized by some other "express statutory provision[]." (§ 1054, subd. (e).) Although the People argue the trial court's order granting the prosecution access to petitioner for purposes of a mental examination is authorized by both Evidence Code section 730 and Penal Code section 1054.4, we conclude neither statute authorizes the trial court's order in this case.

#### a. *Evidence Code section 730*

Evidence Code section 730 provides in pertinent part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, *the court* on its own motion or on motion of any party *may appoint one or more experts* to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. [¶] The court may fix the compensation for these services, if any, rendered by any person appointed under this section, in addition to any service as a witness, at the amount as seems reasonable to the court." (Italics added.) The People argue the trial court's order requiring petitioner to grant a prosecution expert access for an examination is authorized by this statute.

At the threshold, petitioner contends the People forfeited reliance on Evidence Code section 730 because their discovery motion in the trial court

cited only *Carpenter, supra,* 15 Cal.4th 312, and did not seek appointment of an expert pursuant to Evidence Code section 730. Were this merely a situation in which the trial court's order was right for the wrong reason (see, e.g., *People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704]), as the Court of Appeal below held, we would reject petitioner's forfeiture argument. But not only did the People fail to invoke Evidence Code section 730, the trial court did not appoint an expert pursuant to that section, but instead ordered petitioner to submit to an examination by an expert retained by the prosecution. Accordingly, we agree that the People have not preserved this issue for appeal.

### b. *Nontestimonial evidence under section 1054.4*

The People next contend the trial court's order granting access to petitioner for purposes of a mental examination by a prosecution expert is authorized by section 1054.4. That section provides: "Nothing in this chapter shall be construed as limiting any law enforcement or prosecuting agency from obtaining *nontestimonial* evidence to the extent permitted by law on the effective date of this section." (Italics added.) The People focus on the word "nontestimonial," claiming that section 1054.4 authorizes the trial court to order petitioner to allow a prosecution expert access for purposes of a pretrial mental examination because such an examination would not elicit testimonial evidence.

The issue of whether evidence is "testimonial" arises in a variety of contexts. It is often raised in cases involving the validity of a criminal defendant's invocation of the protection of the Fifth Amendment to the United States Constitution. That amendment, of course, provides in pertinent part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." We have explained that this constitutional language " 'protects a person only against being *incriminated by his own compelled testimonial communications.*' (*Fisher v. United States* (1976) 425 U.S. 391, 409 [48 L.Ed.2d 39, 96 S.Ct. 1569], italics added.) Under cases of the [United States] Supreme Court, there are four requirements that together trigger this privilege: the information sought must be (i) 'incriminating'; (ii) 'personal to the defendant'; (iii) obtained by 'compulsion'; and (iv) *'testimonial or communicative in nature.*' " (*Izazaga v. Superior Court, supra,* 54 Cal.3d at p. 366, second italics added.)

The high court has explained the meaning of the term "testimonial" in this context. "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself. [¶] This understanding is perhaps most clearly revealed in those cases in

which the Court has held that certain acts, though incriminating, are not within the privilege. Thus, a suspect may be compelled to furnish a blood sample [citation]; to provide a handwriting exemplar [citation] or a voice exemplar [citation]; to stand in a lineup [citation]; and to wear particular clothing [citation]. *These decisions are grounded on the proposition that 'the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature.'* [Citation.] The Court accordingly held that the privilege was not implicated in each of those cases, because the suspect was not required 'to disclose any knowledge he might have,' *or 'to speak his guilt,'* [citation]. [Citations.] It is the 'extortion of information from the accused,' [citation], the attempt to force him *'to disclose the contents of his own mind,'* [citation], that implicates the Self-Incrimination Clause. [Citation.] 'Unless some attempt is made to secure a communication—written, oral or otherwise—upon which reliance is to be placed *as involving [the accused's] consciousness of the facts and the operations of his mind in expressing it,* the demand made upon him is not a testimonial one.' " (*Doe v. United States* (1988) 487 U.S. 201, 210–211 [101 L.Ed.2d 184, 108 S.Ct. 2341], fn. omitted, italics added.)

We apply the same definition in this state. "The privilege against self-incrimination extends to compelled testimonial or communicative disclosures by an accused, but not to 'real' or 'physical' evidence derived from him. (*Schmerber v. California* (1966) 384 U.S. 757, 760–765 [16 L.Ed.2d 908, 86 S.Ct. 1826]; *People v. Ellis* (1966) 65 Cal.2d 529, 533–537 [55 Cal.Rptr. 385, 421 P.2d 393] [voice identification testimony not protected by self-incrimination privilege].) A defendant's appearance, as manifested in a lineup, is one such type of nontestimonial, physical evidence. Accordingly, it is not protected by the privilege (*United States v. Wade* (1967) 388 U.S. 218, 221–223 [18 L.Ed.2d 1149, 87 S.Ct. 1926]), and evidence of a defendant's refusal to participate in a lineup is admissible at his trial. (*People v. Huston* (1989) 210 Cal.App.3d 192, 216–217 [258 Cal.Rptr. 393]; *People v. Smith* (1970) 13 Cal.App.3d 897, 910 [91 Cal.Rptr. 786] [defendant's refusal, during show-up at police station, to don jacket and cap allegedly worn by robber not protected by self-incrimination privilege]; see also *Quintana v. Municipal Court* (1987) 192 Cal.App.3d 361, 365–366 [237 Cal.Rptr. 397] [defendant's refusal to submit to blood-alcohol test not protected by self-incrimination privilege] . . . .)" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1221–1222 [14 Cal.Rptr.2d 702, 842 P.2d 1], citation omitted; see also *State v. Tiner* (2006) 340 Or. 551, 561–562 [135 P.3d 305, 311–312] [compelled display of defendant's tattoos not testimonial]; *Com. v. Monahan* (1988) 378 Pa.Super. 623, 632 [549 A.2d 231, 235] [gunshot residue test not testimonial for 5th Amend. purposes].)

■ Whether or not the voters intended to wholly incorporate this jurisprudence into section 1054.4 is unclear, and we express no opinion concerning whether the meaning of the term "nontestimonial" as used in section 1054.4 is coextensive with the term's meaning for purposes of applying the Fifth Amendment constitutional privilege.[6] Nevertheless, these cases provide a useful framework for interpreting the statute.

■ Applying the foregoing definitions here, the statements petitioner would make in a court-ordered mental examination would unquestionably be testimonial. Unlike the types of evidence courts previously have determined are nontestimonial (such as blood or urine samples, or handwriting exemplars), the type of evidence that would emerge from a psychiatric examination (drawn from petitioner's own statements) is not physical or observable evidence, but *communicative* information that would have petitioner "reveal, directly or indirectly, his knowledge of facts relating him to the offense" and would require him "to share his thoughts and beliefs with the Government." (*Doe v. United States, supra*, 487 U.S. at p. 213; see also *Pennsylvania v. Muniz* (1990) 496 U.S. 582 [110 L.Ed.2d 528, 110 S.Ct. 2638] [drunk driver's response to question asking the date when he was six years old found to be testimonial].) To determine whether petitioner, at the time of the crime, suffered from a mental condition or was so intoxicated that he did not entertain the mental state required for attempted murder, the People's expert would necessarily need to question petitioner about his feelings, perceptions, memory, and interpretation of the events in question. Petitioner's answers would necessarily be communicative, in that they would communicate his memories and perceptions of the crime and his feelings about it. His comments to the People's expert would necessarily reveal what the United States Supreme Court termed the "contents" and "operations" of his mind. (*Doe v. United States*, at p. 211.) Petitioner's answers to the questions would thus be testimonial in nature within the meaning of section 1054.4.

Evidence produced through such questioning is distinguishable from mere noncommunicative evidence obtained by requiring the defendant to, e.g., stand in a lineup or provide a blood sample or a voice exemplar. For example, there is no showing the People's expert here intends merely to observe petitioner's demeanor, gestures, posture, facial expressions, or voice quality. That type of evidence would not be testimonial for, like a blood sample, its acquisition would not require petitioner to communicate, but only that a witness observe him visually or aurally. A psychiatric examination, by contrast, requires a defendant to communicate, to provide his opinions and

---

[6] Because we are interpreting a statute in this case, our reference to constitutional principles should not be considered definitive or binding in a case where application of the constitutional privilege itself is directly at issue.

ideas, to describe his perceptions, to reveal the contents of his mind; in short, to serve as a witness against himself.

Our conclusion is consistent with the high court's decision in *Estelle v. Smith, supra*, 451 U.S. 454. In that case, the trial court ordered defendant Ernest Smith, who faced the death penalty for his crimes, to undergo a pretrial psychiatric examination by Dr. Grigson to determine whether he was competent to stand trial. After Smith was convicted, Dr. Grigson testified at the penalty phase of trial informing the jury that based on his pretrial examination, he concluded Smith was a sociopath, that no treatment existed for him, that he had no remorse for his crime, and that he would commit similar crimes in the future if given the chance. (*Id.* at pp. 459–460.) On appeal, Smith contended Dr. Grigson's testimony violated his right against compelled self-incrimination. In response, the State of Texas argued no Fifth Amendment violation occurred because Smith's "communications to Dr. Grigson were nontestimonial in nature." (*Estelle v. Smith*, at p. 463.) In support, Texas analogized to cases involving voice and handwriting exemplars, lineups, and blood samples. (*Ibid.*)

The United States Supreme Court rejected Texas's argument. "Dr. Grigson's diagnosis, as detailed in his testimony, was not based simply on his observation of [defendant Smith]. Rather, Dr. Grigson drew his conclusions largely from [Smith's] account of the crime during their interview, and he placed particular emphasis on what he considered to be [Smith's] lack of remorse. [Citation.] Dr. Grigson's prognosis as to future dangerousness rested on statements [Smith] made . . . in reciting the details of the crime. The Fifth Amendment privilege, therefore, is directly involved here because the State used as evidence against [Smith] the substance of his disclosures during the pretrial psychiatric examination." (*Estelle v. Smith, supra*, 451 U.S. at pp. 464–465, fns. omitted.) In other words, the high court found the Fifth Amendment's protections applied because Smith's disclosures in the compelled pretrial psychiatric examination were testimonial in nature.

The People fail to explain why *Estelle v. Smith* is not dispositive here and fail also to cite any apposite authority suggesting that petitioner's statements, uttered in a mental examination, could nevertheless be nontestimonial. Contrary to the People's argument, *Centeno, supra*, 117 Cal.App.4th 30, does not support the notion that statements obtained in the court-ordered mental examination sought by the People would be nontestimonial in character.[7] *Centeno*, as discussed, held section 1376 requires a criminal defendant who

---

[7] The People do not, for example, assert their expert would merely observe petitioner's demeanor or gestures, or conduct a psychological test that would not involve any verbal exchanges. We thus express no opinion on whether an order for such an examination would come within section 1054.4.

raised the issue to submit to an examination by prosecution experts to determine whether he was mentally retarded and, because that section applied, the criminal discovery statutes did not. (*Centeno*, at p. 41.) In a footnoted passage, the *Centeno* court added this dictum: "We also note that the criminal discovery statutes are not applicable to the prosecution's obtaining nontestimonial evidence. (Pen. Code, § 1054.4.) Nontestimonial evidence includes blood samples, urine samples, saliva samples, fingerprints, handwriting exemplars, voice exemplars, writings, and physical lineups. [Citations.] *For purposes of the criminal discovery statutes, nontestimonial evidence may also include psychological testing of mental retardation where otherwise permissible, even though it is considered testimonial for purposes of the privilege against self-incrimination.* (See *People v. Danis, supra,* 31 Cal.App.3d at p. 785.) Here, the expert was precluded from questioning defendant concerning the facts of the case. (Cf. *Estelle v. Smith*[, *supra*,] 451 U.S. 454 . . . .)" (*Centeno*, at p. 41, fn. 5, italics added.)

*Danis,* which *Centeno* cited in support of its statement that evidence obtained from a psychological examination for mental retardation, although considered testimonial for Fifth Amendment purposes, is nontestimonial for section 1054.4 purposes, does not so hold. *Danis* in fact holds that psychiatric testimony *is* testimonial. As the *Danis* court explained: "We do not agree with the trial court's rationale that psychiatric testimony is analogous to handwriting exemplars, chemical tests or the defendant's trying on of clothing which have been classified by the courts as real or physical evidence [citations]. While some state courts have so classified psychiatric tests [citations], *California has considered them as communicative or testimonial in character* [citations]." (*Danis, supra,* 31 Cal.App.3d at p. 785, italics added.) We conclude the *Centeno* court's comment regarding the nontestimonial nature of a psychiatric examination was unnecessary dicta and incorrect in any event.

Although perhaps not every interaction between a psychiatrist and a defendant would necessarily involve testimonial evidence, the People sought access to petitioner for purposes of a mental examination, with no indication their expert would merely observe petitioner's demeanor or gestures, or otherwise attempt to gather some type of arguably nontestimonial evidence. (See fn. 7, *ante.*) We thus assume the People's expert intended to assess petitioner's mental state by conducting the standard type of examination, to wit, by interviewing petitioner. Because the statements obtained in this type of mental examination would be testimonial in nature, section 1054.4 is inapplicable. Accordingly, we conclude section 1054.4 does not authorize the trial court's order granting the prosecution access to petitioner for purposes of a mental examination by a prosecution expert.

### 4. *Is a Court-ordered Psychiatric Examination "Mandated by the Constitution of the United States"?*

Having found neither the criminal discovery statutes (§ 1054 et seq.) nor any other statute specifically authorizes the People to discovery in the form of a court-ordered mental examination of petitioner, we lastly determine whether the trial court's order is "mandated by the Constitution of the United States." (§ 1054, subd. (e).) The People argue that "[t]here is no constitutional impediment to such an examination. Both the United States Supreme Court and this Court have held that a defendant who proffers a defense based upon a mental condition waives his Fifth Amendment privilege against [compelled] self-incrimination . . . to the extent necessary to permit a proper examination of that condition." The People also contend that "a defendant's constitutional rights do not confer upon him the right to present testimony free from the legitimate demands of the adversarial system."

▇ These arguments misapprehend the pertinent inquiry. Section 1054, subdivision (e) authorizes pretrial discovery if "*mandated* by the Constitution of the United States." (Italics added.) That such discovery may be constitutionally *permitted* is insufficient. It is not petitioner's constitutional rights (such as his 5th Amend. rights) that dictate this result, it is the plain language of section 1054. We conclude nothing in the United States Constitution mandates the trial court's order that the People be granted access to petitioner for purposes of a mental examination by a prosecution expert on the ground that he intends to raise a mental defense.

### 5. *Due Process Under the State Constitution*

Finally, the People argue that an interpretation of section 1054 precluding the trial court from ordering petitioner to grant access to a prosecution expert for a psychiatric examination would violate the People's right to due process under the California Constitution. (Cal. Const., art. I, § 29.) That provision states in pertinent part that "[i]n a criminal case, the people of the State of California have the right to due process . . . ." The People argue that included in this right is "the concept of fundamental fairness as well as a meaningful opportunity to be heard" and that "the prosecution cannot meaningfully meet petitioner's evidence without an opportunity to examine petitioner prior to trial."

While it is probable the People could more effectively challenge petitioner's anticipated mental defense if a prosecution expert were granted access to him for purposes of a mental examination, that probability does not establish that denial of such access violates article I, section 29 of the California Constitution. Should petitioner present a mental defense at trial, the People's

strong interest in prosecuting criminals can often be vindicated by challenging that defense in other ways. The People can challenge the defense expert's professional qualifications and reputation, as well as his perceptions and thoroughness of preparation. The People will have access to "any relevant written or recorded statements" examined by Dr. Gomez, "including any reports or statements of experts made in connection with the case, and including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the defendant intends to offer in evidence at the trial." (§ 1054.3, subd. (a).) The People can also have their own experts review Dr. Gomez's report and interview notes and comment on petitioner's alleged mental condition. What the People cannot do, because it is neither authorized by statute nor mandated by the United States Constitution, is have the trial court order petitioner to grant their retained expert access for the purpose of a psychiatric examination. Just as our law, consonant with due process, generally prohibits the People from proving their case against a criminal defendant by using evidence compelled from the defendant's spouse, attorney, priest, or psychotherapist, so does it preclude the People from proving their case by compelling petitioner to grant a prosecution expert access for a psychiatric examination.

CONCLUSION

■ Whether and when trial courts can order persons to undergo an undesired psychiatric examination is a complicated question.[8] This case does not require us to plumb the depths of this complex issue. Instead, we need merely to interpret section 1054. As explained above, we find the trial court's order granting the prosecution access to petitioner for purposes of having a prosecution expert conduct a mental examination is a form of discovery that is not authorized by the criminal discovery statutes or any other statute, nor is it mandated by the United States Constitution. Although we have in the past found merit in a rule authorizing such discovery when a defendant places his mental state in issue (*McPeters, supra*, 2 Cal.4th 1148), following Proposition 115 and the enactment of the exclusivity guidelines in section 1054, subdivision (e), we are no longer free to create such a rule of criminal procedure, untethered to a statutory or constitutional base.[9] Our conclusion renders it unnecessary to decide whether the trial court's order violates petitioner's constitutional rights.

---

[8] See *Ballard v. Superior Court, supra*, 64 Cal.2d 159 (prosecutrix in sex assault case can be required to submit to a psychiatric examination), abrogated by statute, section 1112.

[9] The Legislature remains free, of course, to establish such a rule within constitutional limits.

The case is remanded to the Court of Appeal, which is instructed to issue a writ of mandate directing the trial court to vacate its order and to issue a new order denying the People's motion. Our order staying the examination is vacated as moot. The People remain free on remand to move the trial court to appoint an expert pursuant to Evidence Code section 730 if, in its discretion, it decides that expert evidence "is or may be required."

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.